UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                                                           Case Number 87-10338-BC

v.                                                                      Honorable Thomas L. Ludington

REAL PROPERTY IN SECTION 9,
TOWN 29 NORTH, RANGE 1 WEST,
TOWNSHIP OF CHARLTON,
OTSEGO COUNTY, MICHIGAN,

        Defendants,

DANIEL S. GAHAGAN,

        Claimant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART CLAIMANT'S MOTION FOR SUMMARY JUDGMENT, CANCELLING JULY 9, 2007 HEARING, VACATING JUDGMENT, AND DENYING VARIOUS MOTIONS AS MOOT**

The procedural posture of this *in rem* civil forfeiture action is legend. After approximately twenty years of litigation, the case went to trial on October 24, 2006. On November 1, 2006, the jury found that the government proved that two of the three remaining parcels, C-1 and D-1, were subject to forfeiture on "facilitation" and "proceeds" theories. *See* 21 U.S.C. §§ 881(a)(6); 881(a)(7). Although the jury determined that the final parcel, D-3, was purchased or improved with the proceeds from illegal drug activity, it concluded that claimant Daniel Gahagan was an innocent owner with respect to that parcel.

Thereafter, the parties filed five post-trial motions: (1) a motion by Gahagan for property tax relief and damages; (2) a petition by Gahagan pursuant to the Excessive Fines Clause of the Eighth Amendment; (3) a motion for entry of judgment by the government against Michael Gahagan and

any claims he may have had; (4) a motion by Gahagan, purporting to be the executor of his late mother and former claimant Agnes Gahagan's estate, for attorney fees as a prevailing party under CAFRA; and (5) a motion by Gahagan for judgment as a matter of law. The Court granted the government's motion and concluded all but one of Gahagan's motions lacked merit, his motion for property tax relief and damages.

Initially, the Court had scheduled an evidentiary hearing on the matter, but concluded, after reviewing the parties' submissions and consultation with the parties, that some, if not all, the issues were amenable to disposition as a matter of law under Federal Rule of Civil Procedure 56. Gahagan filed his motion for summary judgment on April 26, 2007. The government has filed a response in opposition. The Court has reviewed the parties' submissions, finds that the relevant law and facts have been set forth in the motion papers, and concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2). The Court now concludes that Gahagan is entitled to judgment as a matter of law with respect to his claim for tax relief, but has failed to establish any entitlement to lost profits.

I.

The facts of this case have been set forth in many opinions of this Court and are not repeated here. The allegations most material to the instant motion were summarized as follows in the Court's March 8, 2007 opinion. For ease of reference, the familiar map depicting the parcels also is set forth below:

> Claimant Gahagan maintains that because the government seized the property, effectively barring him and his family from its beneficial use, the government is responsible for both damages to the property and the real estate tax arrearage for

Parcel D-3 that have occurred over the years. As of February 2007, approximately $48,438.22 was owed on Parcel D-3 in back property taxes. The present market value of Parcel D-3 is approximately $109,890.



Gahagan's argument for damages primarily focuses on Parcel E, which was addressed before trial. Parcel E has somewhat of a contentious history, at least as alleged in Gahagan's papers. According to Gahagan, the government initiated its *in rem* forfeiture action with respect to Parcel E on November 12, 1987 and recorded a notice of lis pendens in Otsego County, Michigan. He claims that the United States Marshal Service seized Parcel E: it held the property in custody "with no right of entry." Claimant's Mot. Property Tax Relief at 5 n. 5. After the government seized the property, oil and gas reserves were discovered in the surrounding area, and that location soon became "one of the largest production fields in Northern America." He notes that in an opinion dated August 28, 1992, the original presiding judge in this action, Judge James P. Churchill, determined that there "was no evidence, direct or circumstantial, that Parcel E was used to facilitate the drug distribution of controlled substances." *Id.* at 6; Dkt # 403, Memorandum Op. at 18 (Aug. 28, 1992). Apparently, in a later opinion, Judge Churchill further concluded "Parcel E was found to have been fully purchased without illegal proceeds and '[n]o interest in Parcel E was found subject to forfeiture in this suit.'" *Ibid*; Dkt # 499, *Ex-Parte* Memorandum Op. at 7 (Oct. 29, 1993).

Despite Judge Churchill's findings, Gahagan maintains, the government continued to hold Parcel E in custody. The government position was that a majority of the claims of the parties remained unresolved and the order was not final for purposes of Federal Rule of Procedure 54(b). (providing "[w]hen more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which

adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties").

Gahagan contends that the government continued to remain unwilling to release the property. In fact, in 1995, he filed a motion to lift the lis pendens. The government opposed and requested "that the lis pendens . . . arising out of this matter be left intact pending resolution of the government's Rule 59(e) motion and any subsequent appeals." *Id.* at 7. On June 22, 1996, Judge Robert Cleland, then presiding, continued the lis pendens. The lis pendens remained in effect until November 15, 1999 when Gahagan ultimately was successful on a second motion to lift the lis pendens. The government sought authorization to appeal the disposition of Parcel E, but was unable to obtain the approval of the Solicitor General. The lis pendens was discharged on December 10, 1999. Gahagan's motion for damages, filed with the second motion to lift lis pendens, was denied for lack of subject matter jurisdiction because the matter otherwise was on appeal to the Sixth Circuit.

The gist of Gahagan's argument for damages is that while the government held parcel E of the property from the time of seizure in 1987 until its release in 1999, it preempted Gahagan's property rights by refusing to allow, after repeated requests, energy companies to extract oil and gas from that parcel. At the hearing, Gahagan made the further allegation that certain companies essentially trespassed onto the property and used a procedure called angle or slant drilling to drain Parcel E of its natural resources. The government believes that any cause of action that the claimant may have for the trespass is against the trespassing parties themselves alone and not against it. Further, the government contends that any claim is time barred because Gahagan was on notice in 1995 that damages to Parcel E may have occurred.

Parcel D-3's history is less contentious, and that parcel was the subject of litigation at trial. Daniel Gahagan's mother, Agnes Gahagan, bought that property in 1975. Later that year, she transferred her ownership in all of Parcel D to Gahagan and his brother Michael Gahagan. The Gahagan brothers made payments on a promissory note to their mother that was secured by a mortgage until November 2, 1987 when a warranty deed was executed indicating that the mortgage note had been paid in full for $55,000. Later that month, the government initiated civil forfeiture proceedings and the property was seized. On August 24, 2004, Michael Gahagan conveyed his ownership in Parcels D-1 and D-3 to Gahagan by way of a quit claim deed. At trial, Parcel D-1 was found to be subject to forfeiture, and the jury found that Gahagan was not an innocent owner of that property. Parcel D-3 similarly was found to be subject to forfeiture; however, Gahagan prevailed as an innocent owner with respect to that parcel. Therefore, the focus of Gahagan's motion for relief from property tax is Parcel D-3.

> The claim for tax relief follows logic similar to the arguments Gahagan advanced as to Parcel E. In Gahagan's view, the government seized the property, without probable cause, and without a hearing under *James Daniel Good*. Seizure, he argues, without fundamental due process also bolsters his contention that the government ought to pay for the trespass and removal of natural resources. Gahagan argues that he and his family were denied access to the property and that the care and responsibility for the property, including paying property tax, was that of the government. Title to the property, Gahagan maintains, effectively passed to the government during the time it unlawfully held the property.
>
> The government disagrees. It insists that Gahagan was welcome to pay the property taxes over the years believing that he would prevail at trial. Further, the government disputes that the claimant was denied all access to the property. In fact, for a short period of time, the government permitted Michael Gahagan to live on the property before his sentencing hearing. Michael Gahagan, the government emphasizes, left the property unsecured when he left. In addition, the government points out that under an order issued by Judge Churchill, a process was established to allow the Gahagan family access to the property. Although the government concedes that the U.S. Marshall Service changed the locks to the dwellings, the government engaged a third-party property manager that was available to accompany and allow the Gahagans access to the buildings. Ultimately, it is the government's position, the Gahagans chose not to avail themselves of this system. Moreover, the government acknowledged at the hearing that it secured the property by placing signs indicating that the property had been seized, but did nothing more because the land was largely undeveloped. Finally, the government surmises that any deficiency under *James Daniel Good* was more than adequately addressed by the findings of the jury based on evidence presented at trial.

Dkt # 822, Op. & Order at 4-8 (Mar. 7, 2007).

II.

When a party moves for summary judgment under Federal Rule of Civil Procedure 56, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden in the first instance of identifying the basis for its motion and designating portions of the record that

-5-

demonstrate the absence of a genuine issue of material fact for trial. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The opposing party may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact"; rather, she must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). An affirmative showing with proper evidence includes designating specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In *United States v. James Daniel Good*, 510 U.S. 43 (1993), the Supreme Court held that the Fifth Amendment's Due Process Clause required notice and an opportunity to be heard before a seizure of real property subject to forfeiture can be had. *Id.* at 53 (reasoning that "[t]he right to prior notice and a hearing is central to the Constitution's command of due process. 'The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment to minimize substantively unfair or mistaken deprivations of property'"). The *Good* Court also explained that the government generally should protect its interest in real property with means less restrictive than seizure:

> The Government's legitimate interests at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property.
>
> Sale of the property can be prevented by filing a notice of lis pendens as authorized

by state law when the forfeiture proceedings commence. 28 U.S.C. § 1964; and *see* Haw. Rev. Stat. § 634-51 (1985) ( lis pendens provision). If there is evidence, in a particular case, that an owner is likely to destroy his property when advised of the pending action, the Government may obtain an ex parte restraining order, or other appropriate relief, upon a proper showing in district court. See Fed. Rule Civ. Proc. 65; *United States v. Premises and Real Property at 4492 South Livonia Road*, 889 F.2d 1258, 1265 (CA2 1989). The Government's policy of leaving occupants in possession of real property under an occupancy agreement pending the final forfeiture ruling demonstrates that there is no serious concern about destruction in the ordinary case. Finally, the Government can forestall further illegal activity with search and arrest warrants obtained in the ordinary course.

*Id.* at 57-58.

When Congress enacted CAFRA, it codified this general presumption against seizure in the ordinary case. Title 18, section 985(b)(1)(A)(B) of the United States Code provides:

(b)(1) Except as provided in this section--

(A) real property that is the subject of a civil forfeiture action shall not be seized before entry of an order of forfeiture; and

(B) the owners or occupants of the real property shall not be evicted from, or otherwise deprived of the use and enjoyment of, real property that is the subject of a pending forfeiture action.

(2) The filing of a lis pendens and the execution of a writ of entry for the purpose of conducting an inspection and inventory of the property shall not be considered a seizure under this subsection.

The entitlement to a hearing also has been subsumed in the statute along with *Good*'s essential holdings. Section 985(d) reads as follows:

(d)(1) Real property may be seized prior to the entry of an order of forfeiture if--

(A) the Government notifies the court that it intends to seize the property before trial; and
(B) the court –
    (i) issues a notice of application for warrant, causes the notice to be served on the property owner and posted on the property, and conducts a hearing in which the property owner has a meaningful opportunity to be heard; or
    (ii) makes an ex parte determination that there is probable cause for the

> forfeiture and that there are exigent circumstances that permit the Government to seize the property without prior notice and an opportunity for the property owner to be heard.
>
> (2) For purposes of paragraph (1)(B)(ii), to establish exigent circumstances, the Government shall show that less restrictive measures such as a lis pendens, restraining order, or bond would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property.

As both *Good* and CAFRA explain, the purpose of requiring the government to use less restrictive means is so that the claimant is not foreclosed from use of his property during the pendency of civil forfeiture action. The *Good* Court reasoned:

> Good's right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance. The seizure deprived Good of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents. All that the seizure left him, by the Government's own submission, was the right to bring a claim for the return of title at some unscheduled future hearing.
> . . .
>
> The seizure of a home produces a far greater deprivation than the loss of furniture, or even attachment. It gives the Government not only the right to prohibit sale, but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property.

*Good*, 510 U.S. at 53-54.

The Sixth Circuit has found that a violation of *Good* does not mean the property is no longer subject to forfeiture. However, a violation of *Good* can give rise to a finding of liability on the government's part:

> The majority of circuits that have addressed this issue, however, have held that a Good violation does not invalidate forfeiture; instead, the government must pay the claimant any damages, such as lost profits or rents, that accrued during the period of the illegal seizure.
> . . .
> We also are persuaded by the approach of the majority of circuits. Where, as in

> O'Brien's case, the government fails to provide pre-deprivation notice and hearing, but the property is found to be subject to forfeiture after the process due has been afforded, the violation does not immunize the property from forfeiture. Rather, the government is responsible for rents and profits of which the claimant was deprived during the period of illegal seizure.

*United States v. Real Property Located at 1184 Drycreek Road, Granville, Ohio*, 174 F.3d 720 (6th Cir. 1999).

### A.

Gahagan contends that because a seizure of Parcel D-3, which he prevailed on as an innocent owner at trial, occurred and he was afforded no pre-deprivation hearing as contemplated by *Good* nor did the government establish that the seizure was the least restrictive means of protecting its interests in the property, the government ought to pay the tax arrearage for that parcel. As a result of the jury's verdict, Gahagan possess a joint tenancy interest in Parcel D-3 with the government with full rights of survivorship. The government consents to a sale of the property.

The parties agree that Gahagan never received a preseizure hearing as contemplated by *James Daniel Good* or CAFRA. In an earlier order, the Court explained that Gahagan had the burden of proof to demonstrate factually that a seizure of the property occurred. The Court reasoned:

> The Court did not hold that the mere fact that no pre-seizure hearing occurred was dispositive of a due process or a CAFRA violation. Rather, the Court sought to present Gahagan the opportunity to demonstrate the requisite factual and legal predicate to proving a due process violation – that he was precluded from the beneficial use of the parcels at issue such that a seizure within the meaning of both *Good* and CAFRA took place.

Dkt # 831, Order Denying Mot. Reconsideration at 3-4 (Apr. 12, 2007). As noted, instead of holding an evidentiary hearing on this issue, the Court determined that Gahagan could, at his urging, attempt to meet his burden by filing a motion for summary judgment.

The Court believes that Gahagan has proved that he was foreclosed from the beneficial use of Parcel D-3 and that a seizure occurred such that he is entitled to remedies under *Good*. The government argues that it simply was not possible to turn back time and afford Gahagan a pre-seizure hearing. However, if a seizure did occur, the government has had approximately fourteen years to remedy such a deficiency. The record clearly reflects that the Gahagan made numerous demands for release of the property.

The government insists that there were several post-seizure hearing where the issue of control was discussed. For instance, all beneficial use of the property plainly was not foreclosed because Michael Gahagan entered into an occupancy agreement with the government. Ultimately, the government contends, Michael Gahagan abused these rights and then abandoned them.

The government also asserts that it is Gahagan's own fault for not requesting an occupancy agreement for himself or to be custodian; he only asked the Court to allow his mother to act as substitute custodian of the property, not himself. Gahagan, the government notes, lived either in Colorado or, when in Michigan, on a small cabin on a parcel no longer at issue in this litigation. At any rate, the Government claims, neither Gahagan nor Michael Gahagan likely would have been suitable custodians of the property: Michael Gahagan did not abide by the terms of the occupancy agreement by breaking an entering into the house on D-1. Gahagan, for his part, chose to live out of state for the pendency of the forfeiture proceedings obtaining a law degree following his conviction. The government concludes that he therefore was absent and was not precluded from any use. Further, when present, Gahagan made unauthorized entries into the secure structures. Thus, in the government's view, there is a reasonable inference that Gahagan caused the damages of which he now complains.

Most importantly, the government maintains that D-3 was seized solely through a *lis pendens* filed against the property, and any belief Gahagan had that he was foreclosed from use of that parcel was mistaken:

> There is no material issue of fact regarding Gahagan's claim that a due process violation arose from the seizure of Parcel D3. The seizure of D3 was effectuated solely through a lis pendens filed regarding the property. It was not posted as subject to seizure nor fenced to preclude entry. If the Gahagans believed that they could not engage in nonconsumptive use of the surface of D3, they were mistaken in that belief. Though the Gahagans apparently had encounters with state or local law enforcement when they engaged in activities directed at the house on Parcel D1, those encounters were not initiated by the Marshal Service as part of that agency's efforts at enforcing the court's seizure order. Exhibit 60, Affidavit of Deputy Fulger, pp. 3-4, ¶¶ 8-9.
>
> Furthermore, Gahagan has not shown that he tried unsuccessfully to use D3, as opposed to the house and garage on D1, much less that any lack of success was due to enforcement of the court's seizure order by the Marshal Service. On the contrary, he conceded during the April 5, 2007 hearing two key facts which preclude any claim for damages from the seizure of Parcel D3: He never sought to use the surface of D3 and D3 is too small to accommodate a well.

Gov't Resp. Br. at 6.

The Court is unpersuaded. The government's arguments and the record demonstrate that the approval of the government was the government's condition precedent to utilizing the property at each step. Indeed, most of the government's contentions militate in favor of a *de facto* finding of seizure. Michael Gahagan, for example, was not allowed to live on the property. He was required to obtain the permission of the *government* to do so. In fact, Michael Gahagan was removed from the property when he did not *use* the property pursuant to the terms set by the *government*. Gahagan apparently was not precluded from beneficial use of the property because he never asked the *government's* permission to be custodian or otherwise occupy. At the same time, the government suggests that neither he nor Michael Gahagan would have been permitted to be custodians because

-11-

they had failed to comply with terms outlined by the government. Any beneficial use of the property, then, appears to be based on government's good graces and in contradiction to *Good* and CAFRA's stated policy "of leaving occupants in possession of real property." *Good*, 510 U.S. at 57-58.

The evidence to which Gahagan cites in his papers supports the claim that the government maintained superior control over the property. Following Michael Gahagan's brief tenure on the property, the Marshals evicted his girlfriend, changed the locks, shutoff the utilities, and otherwise prevented the Gahagans from obtaining their personal belongings. On July 12, 1989, Gahagan filed a motion to permit his mother to be custodian because of the "general disregard and neglect in matters of upkeep and vigilance." Dkt # 70. The government opposed on the grounds that "[t]he property in question is under seizure." The Court permitted Agnes Gahagan to be co-substitute custodian.

Mrs. Gahagan's ability to exercise any control over the property, however, was not realized. In 1991, the Gahagans sought to remove personal belongings in part because of a rash of break ins. The situation was summarized as follows:

> The first time the government was notified and nothing was done to repair the broken doors and locks. The second time it took the government two months before repairs were initiated. The government has repeatedly failed to maintain the premises and has refused to honor Judge Churchill's order allowing co-substituted custodian Agnes Gahagan Riddle access and entry upon reasonable notice. A tree fell on the roof of the house and the government did nothing to repair the roof or remove the tree. Water has been leaking through the ceilings and damaging the dry walling and nothing has been done to stop the leaking. The Marshall office stated by telephone to Agnes Gahagan Riddle that they have a new policy not allowing anyone on the seized property unless accompanied by a representative from their office. The Marshals said that this policy overrides Judge Churchill's order allowing Agnes Gahagan Riddle access upon reasonable notice. Agnes Gahagan Riddle has regularly requested Dennis Crawley to meet with her and his answer is that he is too busy or he never honor his appointments.

Dkt # 250.

The Gahagans asked to move their personal belongings into the garage, but that request too was met with resistance. The government stated that "it is readily apparent that locking and barricading the structures on the seized premises will not suffice to keep the contents of those premises secure." Dkt # 295. Finally, an agreement was reached so that they could "remove all their personally belonging from the subject home and move them into the garage." The government, however, did not provide any of the Gahagans with a key to the locked garage and refused Agnes Gahagan entry. In fact, the Marshal Service conceded:

> I know from my involvement with this particular piece of property that Mrs. Gahagan does not have keys to the residence. In June of 1991, I personally traveled to the residence and inspected it. All of the doors were boarded up from the inside, except for one door on the south side which has been force opened as stated above. The locks on the residence had been changed and a dead bolt lock was placed on the south door of the residence. The most recent change of locks occurred in May of 1991. The only Keys to the new locks are in the custody of property manager, Dennis Crawley, and the U.S. Marshal Service.

The Marshals even appeared to suggest that once the removal of the personal property had been effectuated, the Gahagans no longer would have any right of entry. They explained that "[a]s to entry into this house, it has been our understanding that since the day you removed the items from the house and placed them in the garage, that only the Marshals, or their designate representatives, would be allowed entry into the house."

On March 8, 1993, Gahagan moved for a bond hearing so "that a bond can be substituted for the property to prevent further depreciation." Dkt # 504. The government opposed "the request to substitute a bond for the seizure of the property." Dkt # 511. The government prevailed. On October 5, 1998, Gahagan again sought that bond be substituted for the property at which time the case was on appeal to the Sixth Circuit. The government did "not object to a stay of the judgment pending appeal, provided the claimants will not be given possession of the properties subject to the

appeal." Dtk # 641. The Court ruled that the relief requested was outside of its subject matter jurisdiction. Gahagan filed two final motions to release the property from arrest on September 10, 2001 and October 13, 2006 respectively.

It therefore is apparent to the Court that Gahagan was denied beneficial use of the property. The government, however, attempts to make a fine distinction. Although the house and that parcel (Parcel D-1) may have been seized, nothing precluded Gahagan from using the only parcel at issue here, D-3, which was subject only to a *lis pendens*. That argument is disingenuous.

It is undisputed that Parcel D-1 was seized, and the evidence reflects that the Marshals would only let their representatives onto the property. It is further undisputed that the D-1 was posted with signs informing individuals that the property was seized. In short, the entire Gahagan family was not permitted onto Parcel D-1 or to access the house thereon. There is no evidence that the posting referenced only D-1 as being the subject to forfeiture and that other properties *behind* were accessible without fear of federal prosecution.

Further, there is no evidence that supports the conclusion that Gahagan could have used D-3 without government permission. For example, when Gahagan sought entry onto the property or to release the property from seizure, there was no reference to specific parcels. Nor did the government indicate that although Gahagan could not enter onto D-1, he was more than welcome to utilize D-3 as much as he wanted. The responses from the Marshals at best reference the house and more generally "the property." Moreover, the government appears to share the view that properties around the house were a single unit. It reasoned:

> The house and its surrounding properties are forfeitable for the reasons given above regardless of what particular piece of property the house is built on. Claimants exercised joint control over all of the properties and the properties functioned as a single unit.

Dkt # 332.

In the Court's judgment, only one reasonable inference is possible on the basis of the record. The Marshal service considered access to the property barred to Gahagan, not just Parcel D-1, as did the government until post trial motions. As the beneficial owner of Parcel D-3 from 1987 until the present, the Court concludes that the government is liable for Gahagan's half – as a joint tenant – of the property tax arrearage attributable to that parcel.

B.

Gahagan's claim for lost profits on Parcel E is somewhat more problematic. He summarizes the support for his claim as follows:

> The expert report submitted by John M. Hultin authenticates the amount of lost profits. The report contains estimates from production reports from surrounding wells indicating the average yield per well in the pooling agreement, and the court has documentation of a conservative estimate of revenue during the years of illegal seizure. Parcel E contains enough acreage for one drilling section and other parcels contain enough acreage for another drilling section (Forty Acres). Because the government prevented claimants from executing a lease and claimants own 100% of all the mineral rights, the government is liable for payment to the claimants for 100% of the lost profits, and all the fees and costs.

Gahagan Mot. Summ. J. at 19. Any potential for profit from natural resources is forever lost, in Gahagan's view, because when the *lis pendens* was "lifted December 10, 1999 . . . [n]o drilling companies expressed an interest due to the low yields of the surrounding pooling agreement after years of high production and changes in the statutory drilling requirements." *Id.* at n. 5. In other words, Gahagan maintains that during the time the government exercised exclusive control over the property, the land was drained of any useful natural resources.

In his supplemental expert report, Hultin makes two estimates of lost profits. The first fixes a starting date of December 1998, when field production in the area first began. The second assumes

September 1991 as the starting date, apparently the time when there was the first offer to lease the land for drilling. He concludes:

|  | 100% Ownership | 3/16 Royalty |
|---|---|---|
| Beginning with first field production, Dec. 1988 | $2,143,267 | $413,718 |
| Interest | $1,077,970 | $217,887 |
| Total | $3,221,237 | $631,606 |
| Beginning with first documented offer to lease, Sept 1991 | $1,736,201 | $337,538 |
| Interest | $586,802 | $130,203 |
| Total | $2,323,003 | $467,741 |

Gahagan Reply Br., Hultin Supp. Report.

The government believes that fatal flaw in Gahagan's analysis it that he cannot as a threshold show that any drainage occurred. In support of its contention, the government relies on its expert, Michael W. Barratt. In an affidavit, Barratt averred that it would be impossible to assess lost profits from alleged drainage of resources:

> Based on my 38 years of experience as a petroleum geologist, the majority of which has been in the Michigan Basin, and on the reliable and pertinent sources of information identified above, I conclude that there is no way to accurately determine how much, if any, gas has migrated from the subject property without drilling a well. To date, that has not been done. However, the resources under the property are marketable today.
>
> Mr. Hultin's report and the assumption used in that report reveal that he is not familiar with the production characteristics of the Antrim Shale Formation. The Antrim Formation contains no coals. His reference to the "Antrim Coal area" and his "understanding that the Antrim coal area is very predictable, and that reserves are spread evenly across all the areas that it covers" indicates that his knowledge of the Antrim has been acquired from questionable sources . . . . Without accurate production data and monetary assumptions, no reasonable estimation of damages could have been calculated by Mr. Hultin even if there had been a basis for determining the migration of the resource had occurred.

Gov't Resp. Br. Ex. 62, Barratt aff. at 15.

The Court is constrained to agree with the government. The expert report submitted by

Gahagan is from an accountant, who cannot qualify as having any competency in geology. Although his report employs a methodology based on average production from nearby wells, it does not address the most fundamental issue of whether any drainage has occurred. Even assuming that drainage did occur, the government's expert, a petroleum geologist with thirty-eight years of experience, refutes the accountant's assumption that averaging is an appropriate method to assess lost profits. Barratt notes that yields from individual wells are highly variable and that Hultin's reasoning that the "Antrim . . . area is very predictable," making averaging yields a useful predictor, comes from "questionable sources." Barratt aff. at 10, 13, 15.

The only other support for Gahagan's claim of lost profits from oil or gas revenues are letters by attorney Gretchen Kuhn and Jeffrey Schwartz, both of whom state their belief that Parcel E is being drained of its resources. Kuhn wrote, in relevant part:

> There is significant evidence that drainage is occurring from the wells located off the captioned lands. Such drainage would radically decrease the oil and gas recoverable from the captioned lands, and, thus result in damage to the mineral owners. Once drainage occurs, it cannot be undone, and the hydrocarbons cannot be replaced. Wells located near the lands already have been producing for several years. In order to eliminate any possible further drainage, drilling would on the captioned lands should be initiate at as early a time as possible. Execution of an appropriate oil and gas lease or other similar agreement to a firm qualified to act promptly on this matter and acceptable to all partes to the dispute, is recommended.

Gahagan Mot. Summ. J. Ex. I, Kuhn Letter. In his letter, Schwartz maintained that "there are producing wells that have been drilled in all directions from this property varying in distance from 1/8th mile to 1 mile that are all serving to drain the gas reserves underlying said lands." Gahagan Mot. Summ. J. Ex. J, Schwartz Letter.

These letters, in the Court's judgment, do not establish the existence of a material fact issue necessitating an evidentiary hearing. Kuhn is an attorney and the basis for her assertion is not

otherwise supported in her letter. She plainly is not qualified to make such a conclusion. Nor is Schwartz. He is responsible for negotiating contracts for Energy Quest, Inc. His belief that depletion has occurred similarly is not supported in his letter. Thus, the only evidence in this case offered by an expert who can be qualified concerning oil and gas reserves comes from Barratt. From Barratt's analysis, there is no way to know if any resources have drained. Based on the unique geological features of the Antrim area, there is a possibility that Parcel E retains all its gas reserves that presently could be sold.

Moreover, as the government has argued, if oil companies or other third parties "unlawfully" depleted the property of any reserve, no one has suggested that Gahagan has lost any legal remedy against the drillers. Gahagan therefore has not demonstrated a material fact issue that would require an evidentiary hearing.

### III.

The record establishes that Gahagan is entitled to judgment as a matter of law on his claim for tax relief. For nearly twenty years the government maintained exclusive control of the property precluding Gahagan from beneficial use of Parcel D-3. As a result, the government, the de facto owner of that property, is liable for Parcel D-3's tax arrearage. Gahagan, however, has not shown an entitlement to lost profits from gas revenues because he cannot as a threshold demonstrate that Parcel E has been depleted of its reserves.

Accordingly, it is **ORDERED** that Gahagan's motion for summary judgment and his motion for property damages and relief [dkt #s 802, 836] is **GRANTED IN PART** and **DENIED IN PART**. The government is liable for Gahagan's half, as a joint tenant, of the property tax arrearage on Parcel D-3.

It is further **ORDERED** that the hearing on the motion, scheduled for July 9, 2007, is **CANCELLED**.

It is further **ORDERED** that the government's motion to strike [dkt # 846] and Gahagan's motion for sanctions, recusal, and judgment [dkt # 851] are **DENIED** as moot.

It is further **ORDERED** that this Court's April 12, 2007 judgment of forfeiture is **VACATED**. The government is directed to prepare a final judgment of forfeiture on or before **July 25, 2007** and provide Gahagan with seven days to review the document. The government shall submit the proposed final judgment, together with any comments from Gahagan, to the Court for review on or before **August 6, 2007.**

It is further **ORDERED** that Gahagan's motion to stay judgment [dkt # 834] is **DENIED** as moot.

                s/Thomas L. Ludington
                THOMAS L. LUDINGTON
                United States District Judge

Dated: July 9, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 9, 2007.

                s/Tracy A. Jacobs
                TRACY A. JACOBS